IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SANJAY ANDONISSAMY, | ) | |
| | ) | |
| Plaintiff | ) | Nos. 04 C 2521 . |
| | ) | |
| v. | ) | The Honorable William J. Hibbler |
| | ) | |
| HEWLETT-PACKARD CO., QWEST | ) | |
| COMMUNICATIONS, AND KEN SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Sanjay Andonissamy worked for Hewlett-Packard for two years before Hewlett-Packard fired

him in June 2003. Andonissamy believes Hewlett-Packard and the other defendants discriminated

against him and denied him leave in violation of the Family Medical Leave Act, and filed these suits.

The Defendants move for summary judgment on all of Andonissamy's claims.

### I. Local Rule 56.1

Before undertaking the construction of the factual background, the Court must briefly

comment on the state of Plaintiff's Summary Judgment materials. As an initial matter, the Court

notes that the materials supplied to Chambers have no order that it can discern. For example, after

the statements of fact and briefs, Andonissamy attaches a series of exhibits. Rather than begin with

Exhibit 1, Andonissamy places Exhibit 49 as the first numbered exhibit in the materials. Several

unnumbered affidavits and depositions, also appear early in the compendium. All of the above-

mentioned materials precede an Index of Exhibits, which counsel mysteriously places in the middle

of the compendium of exhibits. Such haphazard and unpredictable organization made the Court's task on summary judgment extraordinarily difficult.

Aside from the seemingly random compilation of Plaintiff's 56.1 materials, Andonissamy consistently violates the spirit, if not the letter, of Local Rule 56.1. For example, Hewlett-Packard alleged it is undisputed that it can terminate an employee under its guidelines for failing to respond to a performance warning, which Andonissamy denied, arguing that he would be returned to work and then placed on probation. (See Pl. 56.1(b)(3)(B) ¶ 68). Hewlett-Packard's proffered fact says nothing about what its human resources personnel said they would do, it speaks only to what it believed it could do under its policies. In another instance, Hewlett-Packard alleges that it is undisputed that Qwest requested that Andonissamy not return to the Cyber Center, which he denies, pointing only to evidence that one employee at Qwest had a good impression of him. (See Pl. 56.1(b)(3)(B) ¶ 96). Again, the evidence pointed to by Andonissamy does nothing to refute Hewlett-Packard's proffered fact. In both instances, Andonissamy mischaracterizes Defendant's proffered fact in order to generate a dispute, which is improper. *See Buttron v. Sheehan*, 00 C 4451, 2003 WL 21801222, *5 (N.D. Ill. Aug. 4, 2003) (striking large portions of Plaintiff's 56.1 Statement).

In other instances, Andonissamy adds needless extraneous information in his statement of fact. For example, Hewlett-Packard proffers a fact alleging that Plaintiff frequently yelled at his supervisor, and Andonissamy responds that he would yell if he felt threatened or frightened. Andonissamy does not dispute that he yelled at his supervisor, he merely supplies additional information about the reasons why he yelled at his supervisor. Local Rule 56.1(b)(3)(C), however, directs parties to supply additional statements of fact in a *separate* statement, so that the Court can

more easily discern which facts the parties dispute. *See* L.R. 56.1(b)(3)(C); *McGuire v. United Parcel Service*, 152 F. 3d 673, 675 (7th Cir. 1998).

The purpose of Rule 56.1 is for the parties to give notice of the factual support of their position and to alert the court of any disputes of material fact. Such a purpose is thwarted when counsel sees to inject argument throughout the statement of fact, and counsel is cautioned that failure to strictly follow the guidelines set forth in Local Rule 56.1 can (and in the next instance, will) result in the Court striking the statement of fact.

## II. Factual Background

Hewlett-Packard hired Andonissamy in April 2001 to work as a Systems Engineer at the Qwest Cyber Center in Chicago, Illinois. (Def. 56.1(a) Statement, ¶ 16).[1] In January 2002, Hewlett-Packard first evaluated Andonissamy's performance, and while his supervisor, Ken Smith, found Andonissamy's technical skills to be strong, he noted that Andonissamy could improve his 'people skills,' including improving his relationships with both customers and coworkers. (Def. St., ¶ 17; Ex. 10).

Smith's worries about Andonissamy's 'people skills' turned out to be well-founded. A few months later, Smith informed Andonissamy, via e-mail, that several coworkers had complained that Andonissamy treated them rudely. (Def. St., ¶18; Ex. 11). Shortly after that, a Qwest employee complained that Andonissamy had been rude and unprofessional in his e-mail correspondence. (Def.

---

[1] Defendant submitted separate statements of fact for each case. Other than the Court's discussion of Plaintiff's FMLA claims, all references in this opinion to a statement of fact are to the statement produced by Defendant for Case Number 04 C 2521.

St., ¶ 19; Ex. 12).[2] In October 2002, a customer of the Qwest Cyber Center had a number of network outages, which it partly attributed to Andonissamy, and as a result, Smith placed Andonissamy on a performance plan whereby his work was monitored for forty-five days. (Def. St. ¶¶ 25-26; Ex. 17).

In November and December 2002, Smith requested that Andonissamy train Ted Fahey so that Fahey could serve as Andonissamy's back up. (Def. St., ¶ 21). Andonissamy, however, failed to complete Fahey's training — although he "set up a sandbox environment, built a Unix box" and installed several programs on Fahey's workstation. (Def. St., ¶ 22, 24).[3] In later defending his actions, Andonissamy explained to Carol Dixon-Woolfolk, an Employee Relations Consultant for Hewlett Packard, that he did not train Fahey because Fahey would not work overtime and because Fahey should have to go to school and work to get his knowledge." (Def. St., ¶ 24; Dixon-Woolfolk Dep. at 142).

Andonissamy's trouble relating with his coworkers, customers, and supervisors continued to escalate. In March 2003, Andonissamy and Smith had a heated discussion regarding an installation that was to occur over the weekend. (Def. St. ¶28). According to Andonissamy, the

---

[2] Andonissamy denies this fact, arguing that "he was not rude to [the Qwest employee] at all," pointing to his email to Smith. Although the fact of whether or not Andonissamy rudely treated a Qwest employee might be in dispute, Hewlett-Packard proffers the fact to show that it received a complaint about Andonissamy from a customer, which is not in dispute.

[3] Andonissamy again denies several facts proffered by Hewlett-Packard, pointing only to his deposition, in which he states that set up a sandbox environment and performed other tasks for Fahey. But Andonissamy's self-serving characterization of what was necessary to "train" Fahey simply is not relevant. Andonissamy points to no evidence that he familiarized Fahey with the GE Medical Systems account on which he worked, which is one task Smith asked him to accomplish. (Smith Dep. at 206-07). Nor does Andonissamy point to any evidence to dispute Dixon-Woolfolk's statement regarding Andonissamy's self-proclaimed reasons for refusing to train Fahey. Consequently, the Court deems Andonissamy to have admitted paragraphs 22 and 24 of Defendant's 56.1 Statement.

4

argument resulted after Smith repeatedly instructed Andonissamy to help with a major installation for Sunday, March 29 and Andonissamy responded by informing Smith that he could not attend the installation because he had a doctor's appointment scheduled for Sunday that he could not reschedule. (Andonissamy Dep. at 300-305; Def. St., Ex. 22).

Smith reported the argument to human resources, and Dixon-Woolfolk conducted an investigation of the incident. (Def. St. ¶¶ 30, 34). Among other things, Dixon-Woolfolk interviewed John Scott, Andonissamy's coworker, who told Dixon-Woolfolk that Andonissamy's yelling was abusive, unprofessional, and insubordinate. (Scott Dep. at 35-36). Scott further told her that Andonissamy yelled at Smith on a weekly basis. (Scott Dep. at 35-36). After the investigation, Dixon-Woolfolk, Shelly Dropkin, Hewlett-Packard's Business Human Resources Manager, and Smith decided to issue Andonissamy a performance warning. (Dixon-Woolfolk Dep. at 52).

The performance warning listed five incidents of insubordination and inappropriate behavior — including the March argument with Smith, an April 2 argument with a coworker, an "unproductive e-mail conversation" with a Qwest employee, an April 19 incident with a coworker that escalated into an argument with Smith, and an April complaint from Qwest regarding an overdue report and a discourteous response to Qwest's request for that report. (Def. St. ¶¶ 39, 42-44; Exs. 25, 29, 30, 32, 33, 34, 35, Smith Dep. at 105).[4] The performance warning sets benchmarks for

---

[4] Andonissamy continues the unproductive pattern of needlessly disputing facts. In response to Hewlett-Packard's Statement of Fact regarding the complaints listed in the performance warning, Andonissamy responds that he "denies the contents of the Performance Warning," pointing to an email he sent to Dixon-Woolfolk in response to the performance warning. Although Andonissamy disagrees with Hewlett-Packard's assessment of the facts that provide the underlying basis of the performance warning, he cannot dispute that Hewlett-Packard's proffered statement of fact accurately recites the contents of the performance warning. Nor does he dispute the contents of e-mails attached as exhibits. Andonissamy suggests these e-mails contain hearsay, but Hewlett-Packard offers them not to show that Andonissamy actually

Andonissamy's future behavior, warning him to avoid unprofessional communication, arguments with his manager, meeting customer deadlines, and eliminating incidents of insubordination and confrontation. (Def. St., Ex. 25). Andonissamy met with Smith regarding the performance warning, but refused to sign it. (Def. St. ¶ 38).

Instead, Andonissamy informed Smith via e-mail that he did not agree with Smith's assessment of his performance. (Def. St., Ex. 38). The next day, Dixon-Woolfolk wrote to Andonissamy and invited him to call her. (Def. St., Ex. 38). Andonissamy responded to Dixon-Woolfolk by sending her (and also Lewis and Dropkin) a lengthy e-mail discussing his problems with Smith. (Def. St., Ex. 39). Among other things, Andonissamy repeatedly questioned Smith's abilities, suggesting that Smith's "lack of technical skills . . . [puts] him in a difficult situation . . . [and] makes him make wrong decisions," that Smith's "command and control approach makes him to [sic] stick to his decisions stupidly and persistently," and that Smith is "very careless." (Def. St., Ex. 39).

Lewis informed Dixon-Woolfolk that he considered Andonissamy's message to be insubordinate and that Andonissamy's response was affecting his team's ability to meet customer deadlines. (Def. St., Ex. 40). Dixon-Woolfolk urged Andonissamy to cease sending e-mails and promised to conduct an investigation of his complaints regarding Smith. (Def. St., Ex. 40). Dixon-Woolfolk interviewed Andonissamy and many of his coworkers. (Dixon-Woolfolk Dep. at 53-73; Def. St., Ex. 20-21).[5] After completing her interviews, Dixon-Woolfolk concluded that

said or did the things described in the e-mail, but to show that his coworkers complained about him.

[5]Andonissamy argues that Exhibits 20 & 21 appear to be notes made by Smith, but Dixon-Woolfolk identified them as the notes she took during her investigation during her

Andonissamy's complaint that Smith was a poor manager was unfounded, and told him so. (Def. St., ¶ 75).

Andonissamy became only more intractable throughout May. On May 7, he failed to report to a scheduled maintenance, informing the customer, but not his employer, that he was sick. (Def. St., ¶ 79-81). During a mid-May performance evaluation, Andonissamy told Smith "he had no problems to work on." (Smith Dep. at 203-07).[6] On May 13, Smith reported Andonissamy's failure to improve his relationships with his coworkers to Dixon-Woolfolk. (Def. St., ¶ 84). After reviewing Smith's allegations, Dixon-Woolfolk recommended that Smith place Andonissamy on probation. (Def. St., ¶ 85). Andonissamy was placed on paid administrative leave on May 22. (Def. St., ¶ 86).

While Andonissamy was on suspension, Qwest complained to Hewlett-Packard about missing documentation regarding their system, environment, and configuration. (Def. St., ¶ 89-90; Exs. 48, 49). As a result of Qwest's concerns, Qwest decided that it would not approve Andonissamy's return to the Qwest Cyber Center. (Def. St., ¶ 96; Lewis Dep. at 60-61). On June 23, Lewis decided to terminate Andonissamy, with input from Smith, Dixon-Woolfolk and Hewlett Packard's legal counsel. (Dixon-Woolfolk Dep. at 126-127; Lewis Dep. at 109-110).

III. Standard of Review

---

deposition.

[6] Again, Andonissamy disputes this fact, pointing to a passage in his own deposition. But nothing in the passage disputes that he told Smith that he had "nothing to work on." Instead, it provides only an additional alleged fact — that Smith laughed at him during his performance evaluation. Consequently, the Court deems Andonissamy to have admitted paragraph 83 of Defendant's statement.

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining summary judgment motions, courts construe the facts and all reasonable inferences in the light most favorable to the non-moving party. *Id.* at 255. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## IV. Analysis

### A. Hostile Work Environment Claims

Andonissamy alleges that Hewlett-Packard subjected him to an hostile work environment based on his national origin in violation of Title VII (Count I). Andonissamy also brings an hostile work environment claim under 42 U.S.C. § 1981 against Hewlett-Packard, Qwest Communications and Ken Smith (Count V).[7] Title VII protects individuals from employers who subject them to hostile work environments. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To survive summary judgment on an hostile work environment claim, a

---

[7] Because a court evaluates § 1981 claims under the same rubric as Title VII claims, it need not address them separately. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293 (7th Cir. 2004).

plaintiff must establish that: (1) he was subjected to unwelcome harassment; (2) the harassment was based on his national origin; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his environment; and (4) there is a basis for employer liability.[8] *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006). In this case, the Court will focus on the latter two elements.

Andonissamy alleges that Smith made several derogatory comments about his national origin, which forms the bases for his hostile work environment claims. Hewlett-Packard first argues that the allegations made by Andonissamy regarding Smith's treatment of him are not sufficiently severe or pervasive to support a claim of an hostile environment. Title VII protects employees from harassment that is sufficiently severe or pervasive that a "reasonable person would find it hostile and which the victim himself subjectively sees as abusive." *Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998). Although the conduct at issue or the environment created need not be "hellish" to create an hostile environment, it must unreasonably interfere with a person's work performance or advancement. *Jackson*, 474 F.3d at 500 (citing *Harris*, 510 U.S. at 22); *Ngeunjuntr*, 146 F.3d at 467 (citing *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed. 2d 49 (1986)).

The alleged remarks complained of by Andonissamy are not sufficiently severe to create an hostile work environment. Andonissamy claims that Smith regularly told him that he could not be the same as his co-workers. This comment, however, does not concern Andonissamy's national

---

[8] *Velez* suggests that the harassment must be severe *and* pervasive, but the Seventh Circuit has repeatedly noted that the conduct need not be both severe and pervasive. *See Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (collecting cases and explaining the severe or pervasive standard).

origin, and even Andonissamy admits that he "didn't understand what [Smith] meant at that time."

In other words, Andonissamy did not interpret the remarks as evidence of hostility towards his

national origin (at least until he filed this lawsuit). Andonissamy also claims that Smith told him that

people graduating from college could not get jobs because of people like him, that jobs in the United

States should be reserved for Americans, and that he would consider resumes only with "American-

sounding" names. (Pl. St., ¶ 12). Many of the alleged comments by Smith refer to a general

population, rather than Andonissamy personally, and consequently lose significance as "second-

hand" harassment. *See McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 567 (7th Cir.

2000) (impact of 'second hand' harassment not as severe as harassment directed at plaintiff).

Accepting as true all of the statements attributed to Smith, Andonissamy fails to show that

Hewlett-Packard subjected him to a sufficiently hostile work environment. The Seventh Circuit

noted that "relatively isolated instances of nonsevere misconduct will not support a claim of a hostile

environment." *Ngeunjuntr*, 146 F.3d at 466-67. In *Ngeunjuntr*, the plaintiff's told him that he did

not "trust the yellow race," that "Middle Eastern people are a pain in the but," and that Ngeunjuntr

should "go back East." *Id.* The comments allegedly made by Smith are comparable to those

allegedly made by the supervisor in *Ngeunjuntr*, and simply don't rise to the level required to create

an hostile environment. *Ngeunjuntr*, 146 F.3d at 467; *see also Racicot v. Wal-Mart Stores, Inc.*, 414

F.3d 675 (7th Cir. 2005) (frequent yelling, swearing and comments about older women in the work

place did not create hostile environment).

Andonissamy points to two additional comments that he alleges Smith to have made occurred

in late 2001. Sometime shortly after September 11, Andonissamy alleges that Smith told him that

all of South Asia should be "flattened," making a pounding motion with a fist upon an open palm

and that people like Andonissamy should be hanged as Africa-Americans had been hanged. (Andonissamy Dep. at 220-222). Andonissamy told no one about either of Smith's alleged remarks and, in fact, failed to raise the latter remark in his EEOC complaints. (Andonissamy Dep. at 220-222; Def. St., Exs. 3-5).

Under Title VII,[9] an individual must initiate his hostile environment claim by filing an EEOC charge within 300 days of the alleged harassment. *Shannoff v. Ill. Dept. of Human Serv.*, 258 F.3d 696, 701 (7th Cir. 2001). Although remarks and conduct in an ongoing pattern of discrimination may be saved by the continuing violation doctrine, that doctrine has its limitations. An employee must assert an hostile environment claim as soon as it was reasonable to conclude that he had a substantial claim under Title VII. *Id.* at 702. To argue that these alleged remarks are so offensive that, even isolated, they would create a hostile work environment places them outside the scope of the continuing violations doctrine, and consequently outside the statute of limitations. The Court need not decide whether these remarks are timely because they too are like those alleged to have been made in *Ngeunjuntr.* Consequently, the Court holds that, even accepting as true Andonissamy's allegations regarding Smith's conduct, he has failed to allege sufficient facts to demonstrate that Hewlett-Packard, Qwest Communications, or Smith subjected him to an hostile work environment.

Even if the Court were to consider the alleged remarks to have created an hostile work environment, Andonissamy can point to no basis for employer liability for Hewlett-Packard (and certainly there is no basis for employer liability for Qwest, as Smith did not work for Qwest and

---

[9] The Court notes that under the four-year statute of limitations for § 1981, there is no question of timeliness for the alleged remarks.

Andonissamy makes no allegations that any Qwest employee contributed to any alleged hostile environment). An employer is liable for an hostile environment created by a co-worker only if it was negligent in discovering or remedying the harassment. *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006). For the purposes of Title VII, a supervisor is a person with the power to directly affect the terms and conditions of the plaintiff's employment, and not someone who simply possesses authority to oversee the aspects of the plaintiff's job performance. *Id.*

Andonissamy argues that Smith had the authority to direct his work responsibilities and evaluate his work performance, but these are precisely the types of activities that the Seventh Circuit has explicitly stated *do not* qualify someone as a supervisor. *Rhodes v. Ill. Dep't. Of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004). Andonissamy also claims that Smith had the authority to discipline him. The record, however, demonstrates that while Smith could recommend an employee receive a performance warning, he had to seek input from human resources (Smith Dep. at 147, 184-187; Dixon-Woolfolk Dep. at 51-52). Further, Smith did not have authority to place Andonissamy on probation or to terminate him. (Def. St. ¶¶85, 102-03). Consequently, the Court holds that Smith could not be considered Andonissamy's supervisor for purposes of Title VII liability.

Andonissamy never gave anyone at Hewlett-Packard an opportunity to remedy the allegedly hostile environment. Andonissamy argues that he made several complaints about Smith to both Lewis and Dixon-Woolfolk. (See Andonissamy Dep. 112-13, 130-31; Pl. St., Ex. 4; Def. St., Ex. 22). Although Andonissamy sent Lewis and Dixon-Woolfolk several e-mails complaining about the manner in which Smith treated him, none of these e-mails mentioned that he believed Smith discriminated against him (only that he had disagreements with Smith). Moreover, Andonissamy

sent the e-mails after the alleged remarks made by Smith and does not allege that the hostile work environment continued after he complained about Smith.

Because Andonissamy fails to show that Hewlett-Packard subjected him to harassment sufficiently severe to alter the conditions of his environment and because even if he could Andonissamy can point to no basis for employer liability, the Court GRANTS summary judgment in favor of all Defendants on Andonissamy's hostile work environment claims (Counts I & V).

*B.    Disparate Treatment in Condition of Employment*

Andonissamy next alleges that Hewlett-Packard subjected him to disparate treatment in the conditions of his employment based on his national origin in violation of 42 U.S.C § 1981. Andonissamy's disparate Treatment in the conditions of his employment rests on allegations regarding his on-call schedule, the granting and accumulation of vacation days, the issuance of his performance warning, and Hewlett-Packard's decision to place him on paid administrative leave.

A plaintiff may prove a disparate treatment claim using either the direct method or the indirect method. *Sun v. Bd. of Trustees of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007). Under the direct method, a plaintiff must point to direct or circumstantial evidence that points directly to a discriminatory reason for the disparate Treatment. *Id.* Under the indirect method, a plaintiff proceeds under the familiar burden-shifting method articulated first in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1975).

Many of Andonissamy's claims regarding differential treatment simply have no merit. For instance, Andonissamy first claims that Hewlett-Packard gave him a less favorable call-schedule than non-Indian employees. But the evidence in the record simply does not support Andonissamy's claim. Hewlett-Packard employed three TSG-2 or TSG-3 system engineers (Andonissamy, John

13

Scott, and John Quintas), and placed all three on-call at all times. (Scott Dep. at 24-25; Smith Dep. at 17-23). Andonissamy argues that Quintas worked only 40-50 hours per week and that Scott worked only two weekends per month (whereas Andonissamy himself worked every weekend). But nowhere does Andonissamy point to evidence to demonstrate that Quintas and Scott were not on-call at all times.

Andonissamy next claims that Hewlett-Packard more readily allowed other similarly situated employees to use their vacation time. Although Andonissamy testified that Hewlett-Packard denied him vacation time, he submitted no evidence that he ever formally requested any — there are no leave requests, e-mails, or any other evidence in the record that Andonissamy ever requested (and was denied) time off. The record, however, does contain evidence that when Andonissamy requested vacation time, Smith granted it. (Def. St., Exs. 54-55).

This leaves only Andonissamy's claim that Hewlett-Packard issued him, and not others, a performance warning and placed him on administrative leave because of his national origin. Most of the alleged remarks made by Smith bear no relation to the altered conditions of employment about which Andonissamy complains, and therefore he cannot proceed under the direct method. *See Sun*, 473 F.3d at 813 (string of isolated remarks insufficient to proceed under direct method); *Velez*, 442 F.3d at 1049 (to proceed under direct method, evidence must show intent to discriminate). Although Andonissamy alleges that Smith once told him that "you people don't need weekends off," this stray remark bears little relation to the disparate treatment about which Andonissamy complains. Consequently, Andonissamy is left to pursue his claims under the indirect, burden-shifting method.

Andonissamy claims that Hewlett-Packard issued him a performance warning and placed him on administrative leave "based on a false accusation" and that Hewlett-Packard did not issue

14

performance warnings to his coworkers for making such false accusations. Here, Andonissamy invites the Court to review the wisdom of an employer's decisions, which is inappropriate. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006); *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 648 (7th Cir. 2006). Instead, Andonissamy must point to employees who engaged in the same pattern of behavior as he did, who were outside the protected class, but who were treated more favorably. Andonissamy failed to point to any other Hewlett-Packard employees who repeatedly argued with and shouted at their supervisor, sent unprofessional e-mails to customers, and engaged in other incidents of inappropriate or insubordinate behavior who nevertheless did not receive a performance warning. Consequently, the Court GRANTS Hewlett-Packard's motion for summary judgment on Count II.

## C.   *Disparate Treatment in Termination of Employment*

Andonissamy's claim that Hewlett-Packard discriminated against him on the basis of his national origin when it fired him is likewise without merit. As noted earlier, Andonissamy has produced no evidence by which he could proceed under the direct method. Under the indirect method, Andonissamy must show, among other things, that he was meeting Hewlett-Packard's legitimate expectations. Andonissamy cannot do so.

In the May 2003 performance warning, Hewlett-Packard noted that Andonissamy had engaged in multiple incidents of inappropriate, unprofessional, and insubordinate behavior. He repeatedly argued with his coworkers, with Qwest employees, with his supervisor. Qwest (Hewlett-Packard's customer) complained that he did not timely complete a report and that it received a discourteous response when it requested that report. He failed to call his supervisor — or anyone at Hewlett-Packard — to report that he would not be able to attend an important software

installation. And, when Hewlett-Packard's human resources personnel attempted to correct Andonissamy's behavior, rather than focusing on ways to improve, Andonissamy spent his working hours composing several e-mails lambasting his supervisor and launching personal attacks on his supervisor's competency.

Andonissamy argues that he received a favorable performance evaluation, and therefore Hewlett-Packard's concerns over his insubordinate behavior must be pretextual. *See Flores v. Preferred Tech. Gr.*, 182 F.3d 512 (7th Cir. 1999) (noting that the issue of whether an employee met her employer's legitimate expectations merged with the issue of whether the employer's reasons for terminating her were pretextual). But to demonstrate that the employer's reasons were pretextual, Andonissamy must show that the employer's reasons were factually basis, not the actual motivation for his discharge, or insufficient to motivate the discharge. The Court's only concern in reviewing an employer's reasons for termination is the honesty of the employer's beliefs. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir.2006).

Andonissamy points to no evidence suggesting that Lewis and Dixon-Woolfolk did not honestly believe that he had been grossly insubordinate and, despite being given numerous opportunities to amend his behavior, grew more insubordinate. Indeed, Andonissamy puts forth little evidence regarding the decision makers at all. Instead, Andonissamy argues that Smith participated in the decision to terminate him and therefore his prejudice infected the process. But, even accepting that statement as true (and there is nothing in the record to support it), Dixon-Woolfolk and Lewis conducted their own investigation of Andonissamy's behavior and also an investigation of Smith himself, and Andonissamy produces no evidence to suggest that Smith tainted these investigations in any way. *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547-48 (7th Cir. 1997) (non-

decisionmaker's animus did not taint decision when decisionmaker conducted own investigation and gave plaintiff opportunity to describe her version of events).

Andonissamy also argues that his fairly recent positive performance evaluation demonstrates that Hewlett-Packard's proffered reasons for firing him — that he was insubordinate — was pretextual. First, even though Andonissamy received satisfactory remarks for his technical skill, the record demonstrates that Hewlett-Packard had, for some time, concerns about Andonissamy's anti-social behavior towards his coworkers, customers, and supervisors. *Anderson v. Stauffer Chem, Co.*, 965 F.2d 397, 403 (7th Cir. 1992) (mere fact that an employee does some things well does not mean that any reason given for his firing is a pretext for discrimination).

Andonissamy submits no evidence that Lewis or Dixon-Woolfolk did not believe that he was grossly insubordinate and that even after being issued a performance warning continued his insubordinate behavior. Consequently, the Court GRANTS Hewlett-Packard's motion for summary judgment on Count III.

D.    *Retaliation Claim*

Andonissamy's retaliation claim merits little discussion. The gist of Andonissamy's retaliation complaint is that Hewlett-Packard moved against him only after he complained about Smith's treatment of him. A multitude of problems exist with Andonissamy's claim. First, Andonissamy never told Lewis that he believed Smith discriminated against him. Instead, Andonissamy only told Lewis that he was having trouble with Smith. Thus, he never engaged in statutorily protected activity. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir. 2006). Second, the timing of Hewlett-Packard's actions are not remotely suspicious. Andonissamy first complained about Smith's behavior *after* Lewis and Dixon-Woolfolk had already served him

17

with a performance warning. Even though Hewlett-Packard shortly thereafter terminated Andonissamy, Hewlett-Packard human resources personnel had been discussing his disciplinary problems for some time, and the mere temporal proximity of his termination to his general complaint to Lewis is insufficient to demonstrate a retaliatory motive. *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758-59 (7th Cir. 2006); *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005). Finally, as described above, Andonissamy could not demonstrate that Hewlett-Packard's reason for terminating him were pretextual. Thus, the Court GRANTS Hewlett-Packard's motion for summary judgment on Count IV.

### E.    FMLA Claim

Among other things, the FMLA requires employers to provide eligible employees with unpaid leave because of a serious health condition. The FMLA defines a serious health condition as an illness, injury, impairment or physical or mental conditions that require inpatient care or which cause a period of incapacity during which a person is unable to work, attend school, or perform regular daily activities. *See* 29 C.F.R. 825.114(a). Andonissamy cannot demonstrate that he had a serious health condition.

Andonissamy claims that because he took medication for depression (and because Smith knew he took such medication) that Hewlett-Packard should have given him leave under the FMLA rather than terminate him. Andonissamy, however, admits that his doctor never placed any restrictions on his ability to work or perform daily activities. (Pl. 56.1(b)(3)(B) St. ¶¶ 7-33). His doctor never diagnosed him with clinical depression and never referred him to a psychiatrist. (Pl. 56.1(b)(3)(B) St. ¶¶ 42-45). Moreover, Andonissamy admits that he was able to perform his job

throughout March, April, and May 2003 (Pl. 56.1(b)(3)(B) St. ¶ 6). In other words, Andonissamy makes no real argument that he had a serious health condition.

Andonissamy does suggest that the FMLA allows for intermittent leave, which is correct. He fails, however, to demonstrate that he himself had a need for intermittent leave. Andonissamy's doctor never believed that he required it — never once suggesting that Andonissamy take some time off or referring him to a specialist or to inpatient care. 29 C.F.R. § 2613(b)(4)(B) (allowing employers to request certification from health care provider stating that employee is unable to perform functions of his job). Moreover, Andonissamy himself admitted that he did not require it. In short, Andonissamy never suffered even an episodic "period of incapacity." *See Haefling v. United Parcel Serv.*, 169 F.3d 494, 499-501 (7th Cir. 1999) (discussing requirement that plaintiff show he was unable to work).

Hewlett-Packard also contends that Andonissamy failed to provide it with sufficient notice. The Court need not address this argument as Andonissamy so clearly fails to demonstrate that he suffered from a serious health condition. The Court GRANTS Hewlett-Packard's motion for summary judgment on Andonissamy's FMLA claims.

IT IS SO ORDERED.


5/30/07
Dated

Hon. William J. Hibbler
United States District Court